# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| OSTERIA SEGRETO, LLC d/b/a THE BARBER SHOP BLACKSTONE,<br><br>**Plaintiff,**<br><br>v.<br><br>MICHAEL HILGERS, Attorney General of Nebraska, in his official capacity; TARA J. STERNS, JOSEPH A. SCOVILLE, and COURTNEY A. DAUBENDIEK, in their official capacities as members of the Nebraska Board of Barber Examiners,<br><br>**Defendants.** | Case No. 8:26-cv-65<br><br><br>**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Defendants, Michael Hilgers, in his official capacity as Attorney General of Nebraska, and Tara J. Sterns, Joseph A. Scoville, and Courtney Daubendiek, in their official capacities as members of the Nebraska Board of Examiners (collectively the "Barber Board"), by and through counsel, hereby submit the following Brief in Opposition to Plaintiff's Motion for Preliminary Injunction. (Filing 7).

## INTRODUCTION

Barbering is an ancient and proud profession, and their symbols have long been reserved for their sole use for the benefit of public health and safety. Plaintiff has chosen to use these symbols in a knowingly deceptive fashion that violates

Nebraska law and infringes on the Barber Board's trademarks. This Court should reject Plaintiff's claims in this matter and uphold Nebraska's statute.

Plaintiff runs a speakeasy. Speakeasys operate on the principle of deception. They are, by design, a public house that appears at first glance to be something else. This is often lawful. A speakeasy may, for instance, operate "behind" another lawful business (so long as they are in compliance with liquor laws). Or a speakeasy may operate behind a nondescript door in an alley. What a speakeasy may not do, however, is operate behind the mere façade of a regulated business while using advertising and signage that is specifically reserved by statute and trademark for members of the regulated industry. Such use of advertising and signage is inherently misleading in an area relating to public health, safety, and welfare and does not receive protection from the First Amendment. That is exactly how the Plaintiff has chosen to operate.

As an initial matter, the subject of Plaintiff's Complaint is commercial speech—logos and signage used to advertise their business. And Plaintiff's commercial speech is clearly misleading. The State is entitled to curb misleading commercial speech without restriction under the First Amendment. This should end the inquiry.

Also central to the commercial speech analysis are Nebraska's trademarks. The Barber Board has a common law certification mark in the term "barber shop" and display and use in advertising of the barber pole that is statutorily protected. It also holds a registered certification mark in the barber pole. Regardless of the

constitutional claims involved, Plaintiff does not have a right to infringe upon the Barber Board's trademarks for commercial gain.

Should the Court get there, Plaintiff's claims also fail the *Central Hudson* test. Under *Central Hudson*, commercial speech regulations are unconstitutional if the speech is not unlawful or misleading, the State has a substantial interest in regulating the speech, and the restrictions further that purpose and are not more extensive than necessary to accomplish the State's substantial interest. Plaintiff's commercial speech is both misleading and unlawful under Nebraska's Trademark Registration Act. The State has a substantial interest in reserving both the term barber shop and the display and use in advertising of the barber pole in connection with licensed barbers alone—a group trained and held to high standards for public safety relating to their regulated conduct, including shaving with a straight razor and using harsh chemicals in the treatment of hair. The restrictions directly further that interest. And the restrictions are not more extensive than necessary. The two areas of restricted speech are extremely narrow—use of the two-word title "barber shop" and the display and use in advertising of a barber pole—and serve to avoid public confusion about the regulated nature of the business and the quality of services they perform. Under *Central Hudson*, Plaintiff's claims fail.

No emergency exists that would justify the issuance of a preliminary injunction. There is no irreparable harm when a person uses a certification mark without permission and in a deceptive manner. Nor does the Barber Act violate Plaintiff's First Amendment rights; the Barber Act is meant to prevent unlicensed

businesses from holding themselves out as barbers. This Court should maintain the status quo and allow the case to proceed to a final resolution.

## BACKGROUND

For nearly a century, the State of Nebraska has regulated the practice of barbering. The Barber Act—Neb. Rev. Stat. §§ 71-201 to 71-261—was first enacted in 1927. Laws 1927, ch. 163 §§ 1 to 23; Comp. Stat. 1929 §§ 71-2001 to 71-2027. In 1963, the Barber Board became independently authorized to regulate the profession and enforce the Barber Act. Rev. Stat. 1943 § 71-221 (Cum. Supp. 1965). Since at least 1967, licensed barbers were required to display a barber pole in each barber shop. (Filing 13-1, ¶ 36). And in 1987, the Barber Board registered a trademark with the Nebraska Secretary of State for a barber pole—"spiral stripes red, white and blue or any combination of them." (Filing 13-9). The Barber Board must consent to the display of its trademark if the person is not licensed under the Barber Act. (Filing 13-1, ¶¶ 30-32); (Filing 13-3); *see also* Neb. Rev. Stat. § 87-139 (Reissue 2024).

One of the Barber Board's statutory duties is to ensure that only licensed barbers or barber shops use or display a barber pole in advertising. (Filing 13-1, ¶ 8); Neb. Rev. Stat. § 71-222.01 (Reissue 2018). A barber pole signifies the licensee is regulated by the Barber Board and has undergone the requisite training to engage in the practice of barbering. (Filing 13-1, ¶¶ 14, 16-17, 19-21, 36); Neb. Rev. Stat. § 71-201(6). The privilege to display a barber pole is one of the many reasons why a person chooses to become a licensed barber. (Filing 13-1, ¶ 37).

In 2009, it became a statutory violation of the Barber Act for an unlicensed business to use or display a barber pole in advertising and use the title barber or barber shop in a way to indicate barbering services are offered. L.B. 195, 101st Leg., § 53 (2009) (amending Neb. Rev. Stat. § 71-201). Prior to 2009, the Barber Board regularly sent demand letters to unlicensed businesses holding themselves out as offering barbering services. (Filing 13-1, ¶¶ 24-25). But in 2004, a tanning salon that held itself out as offering barbering services contested the Barber Board's authority to demand unlicensed businesses stop advertising barbering services without a licensed barber on staff. (Filing 13-1, ¶ 26); (Filing 13-2).

The 2004 dispute with the tanning salon led the Barber Board to seek a legislative change to codify the existing exclusive use of their mark and make their authority clear. (Filing 13-2 at 3). Those efforts resulted in the Nebraska Legislature's amendment of the Barber Act to explicitly prohibit the use or display of a barber pole in advertising and using the title barber or barber shop unless licensed. *See* L.B. 195, 101st Leg., § 53 (2009). Plaintiff alleges these prohibitions violate their First Amendment commercial speech rights.

The Barber Board regularly receives complaints that unlicensed businesses are using a barber pole in advertising or using the title barber shop in a manner to indicate barbering services are offered. (Filing 13-1, ¶ 23). On April 7, 2025, the Barber Board received such a complaint regarding Plaintiff's business. (*Id.* ¶ 39); (Filing 13-6, ¶ 15); (Filing 13-8). Another barber who works in Omaha's Blackstone district was scrolling Facebook and came across several posts advertising "The

Barber Shop Blackstone." (Filing 13-6, ¶ 4). The posts advertised a store called "The Barber Shop" and featured images of a barber pole, barber chair, and represented that guests could expect "special guest barbers." (*Id.* ¶¶ 5-7); (Filing 13-7); (Filing 13-8 at 1, 6). These advertisements caused the complainant to become confused about whether Plaintiff offered barbering services. (Filing 13-6, ¶ 8).

The complainant contacted Plaintiff after she became aware that several of her clients were also confused about whether Plaintiff offered barbering services. (*Id.* ¶ 11). Rather than take the complainant's concerns seriously, Plaintiff posted her email and their reply on their Facebook page. (*Id.* ¶ 12). That same day, the complainant submitted a complaint to the Barber Board along with screenshots of the images she saw on social media. (*Id.* ¶¶ 13-15); (Filing 13-8).

The Barber Board began investigating Plaintiff's business when it received the complaint. (Filing 13-1, ¶ 43). Per the Barber Board's regular practice, a letter was sent to Plaintiff informing them that they were in violation of the Barber Act because they are using a barber pole in advertising and using the title barber shop in a manner to indicate that barbering services are offered without a license. (*Id.* ¶ 44). The Barber Board's Executive Director visited Plaintiff's business and photographed a barber pole as the only visible signage. (*Id.* ¶¶ 45-46); (Filing 13-4). The Barber Board eventually met with Plaintiff and reached an agreement that Plaintiff would change the colors on its barber pole and alter its name. (Filing 13-1, ¶¶ 47-60); (Filing 13-5). Plaintiff, however, failed to implement the agreed-upon changes. (Filing 13-1, ¶¶ 61-63). This lawsuit followed shortly thereafter.

A barber shop that serves alcohol is not a new concept in Nebraska. *Contra* (Filing 1, ¶¶ 4-5). In Nebraska, licensed barber shops can also be authorized to sell alcohol under specific restrictions—and the Barber Board has issued a few such licenses in the last eight years. (Filing 13-1, ¶ 64). An example of a barber shop in Nebraska that also serves alcohol is Scissors & Scotch. (*Id.* ¶ 65). In these situations, the Barber Board has consistently required the licensed barber shop to be separated from the bar with a floor to ceiling wall and self-closing doors. (*Id.* ¶ 64). The Barber Board inspects only the barber shop portion of the business. (*Id.* ¶ 65).

Barber shops that serve alcohol are not confusing to the public. It is Plaintiff's operation of a speakeasy hiding behind the façade of a licensed barber shop, however, that does create confusion. Defendants should not be enjoined from enforcing Nebraska law to protect consumers against Plaintiff's deception.

## STANDARD OF REVIEW

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (quoting *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022)). The burden is on the Plaintiff to show "such extraordinary relief is warranted." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). The party seeking a preliminary injunction must show: "(1) the threat of irreparable harm; (2) the state of balance between the harm and the injury granting an injunction will inflict on other parties; (3) the probability it will succeed on the merits; and (4) the public interest." *Id.* (citations omitted).

## ARGUMENT

**I.     The Barber Board's actions in seeking to enforce its trademarks do not violate Plaintiff's commercial speech rights.**

The Plaintiff is not likely to succeed on the merits of their claim because trademark law generally prevails over the First Amendment when there is unauthorized use of a certification mark as a source identifier. The Barber Board has a registered certification mark in the barber's pole and a common law certification mark in the title "barber shop." Both certification marks are also statutorily protected. Only licensed barbers are authorized to use these marks.

The distinction between trademark law and the First Amendment depends upon how the mark is used. *See Yankee Pub. Inc. v. News America Pub. Inc.*, 809 F.Supp. 267, 276 (1992) ("[W]hen unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right."). "The trademark law generally prevails over the First Amendment when another's trademark (or confusingly similar mark) is used without permission as a means of source identification." *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 159 (2023); *see also Vidal v. Elster*, 602 U.S. 286, 296 (2024); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402-03 (8th Cir. 1987).

"Certification marks are used by a person other than its owner with authorization from the owner." *Bureau Nat'l Interprofessional du Cognac v. Cologne & Cognac*, 110 F.4th 1356, 1362 (Fed. Cir. 2024) (quoting 15 U.S.C. §§ 1127(1), 1064(5)). Certification marks "generally 'certify regional or other region, material,

Page **8** of **29**

mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization." *Id.* "Certification marks are therefore entitled to the same protections as trademarks." *Id.*

The title "barber shop" and the use and display of the barber pole are certification marks held by the Barber Board. When a barber becomes licensed, the licensee is required to display the barber's pole and use the title barber or barber shop. 51 Neb. Admin. Code, ch. 3, § 003.01A; (Filing 13-1, ¶ 8). When these marks are used, it certifies the "services w[ere] performed by members" of the profession. *Cologne & Cognac*, 110 F.4th at 1362. Consumers know the display of these marks indicates the person is a licensed barber. 51 Neb. Admin. Code, ch. 3, § 003.01A; (Filing 13-1, ¶¶ 8, 13, 34-36). And licensed barbers are held to rigorous standards and requirements to assure high quality services are offered. *See, e.g.*, 51 Neb. Admin. Code, ch. 3, 5-7, 8-9, 12-13.

The Barber Board's certification marks are valid trademarks. *See* (*Id.* ¶¶ 34-36); *Cologne & Cognac*, 110 F.4th at 1362. The registered certification mark is a symbol that identifies and distinguishes the source of services of a licensed barber. 1 McCarthy on Trademarks and Unfair Competition §§ 9:7.75, 9:12 (5th ed.). And the title "barber shop" is a common law certification mark with historical significance and a meaning that identifies the services of a barber licensed under the Barber Act. *See id.* § 9:7.75; (Filing 13-1, ¶ 34). The Barber Act merely codified these preexisting

trademark rights. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 532-35 (1987).

"There is no doubt" the Barber Board can own certification marks. McCarthy § 9:7.75, *supra.* "As long as a common law certification mark has been shown to have been in use prior to the date of the junior mark and not abandoned, it is entitled to the same level of protection against likelihood of confusion and dilution as a registered mark." *Cologne & Cognac*, 110 F.4th at 1363. Plaintiff's use began in early 2025, whereas the Barber Board's use dates back at least until 1967. (Filing 13-1, ¶¶ 34-36).

Trademarks are evaluated under the likelihood of confusion analysis. *See H&R Block, Inc.*, 58 F.4th at 946-47. Likelihood of confusion is context-specific, designed "to guide the finder of fact towards considerations generally thought to be material to the consuming public's understanding of product source or affiliation." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 934 (8th Cir. 2011). Common sense guides the analysis. *See id.* In the Eighth Circuit, presale confusion is actionable. *Id.* at 935-36 (citing 3 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.)).

Here, there is no question that Plaintiff is using the Barber Board's certification marks in a manner that causes confusion. The whole dispute arose because another barber located in Omaha's Blackstone district saw Plaintiff's social media advertisements and was confused about whether they offered barbering services. (Filing 13-6, ¶ 8). And when the other barber realized her clients were also

confused, she contacted Plaintiff and filed a complaint with the Barber Board. (Filing 13-6, ¶¶ 10-14).

There is also no question that Plaintiff is using the registered certification mark in a source identifying manner. The only signage Plaintiff utilizes for its business is the red, white, and blue diagonal striped pole. (Filing 13-4); (Filing 13-9 at 1). Plaintiff's use of the certification mark in this manner identifies to the public that certain services are offered. *Cologne & Cognac*, 110 F.4th at 1362. And when licensed barbers are only authorized to use the certification mark in this manner, Plaintiff dilutes the protections afforded to the profession. *Id.* at 1363.

Further, it is not uncommon in recent years for barber shops to also serve alcohol. The Barber Board has recently issued a few licenses to barber shops that also serve alcohol. (Filing 13-1, ¶¶ 64-65). Barber shops that choose to serve alcohol are subject to strict requirements, including a separating wall and self-closing door. (Filing 13-1, ¶ 64). By all appearances, Plaintiff meets the requirements of a licensed barber shop that also serves alcohol. *Compare* (*id.*), *with* (Filing 13-8 at 6-8).

Trademark infringement is not protected by the First Amendment. Both certification marks carry distinctive meanings, and through the Barber Board's own efforts, the Legislature's "decision to grant the [Barber Board] a limited property right in the [certification marks] falls within the scope of trademark law protections, and thus certainly within constitutional bounds." *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 534-35. Because Plaintiff is infringing on the Barber Board's

trademarks, they have no First Amendment claim here. The Court should deny Plaintiff's request for a preliminary injunction.

## II. The State is entitled to restrict misleading commercial speech, and the restrictions satisfy *Central Hudson.*

The State's restrictions on Plaintiff's commercial speech do not violate the First Amendment. "Commercial speech receives a limited form of First Amendment protection." *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 535 (internal citations and quotations omitted). Misleading and unlawful commercial speech is not protected. *Central Hudson Gas & Elec. Corp. v. N.Y. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980); *Friedman v. Rogers*, 440 U.S. 1, 9 (1979). Plaintiff's commercial speech here is misleading and unlawful. Even if it were not, the restrictions satisfy *Central Hudson* because the State has a substantial government interest in protecting the exclusive marks associated with barbering, which the restrictions directly advance. And the restrictions are narrow—certainly not more extensive than necessary to further the government's substantial interests. *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 536-37 (citing *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968)).

### A. *Plaintiff's speech is misleading and unlawful.*

The Barber Act does not restrict Plaintiff's commercial speech rights because the First Amendment does not protect misleading or unlawful commercial speech. *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 564; *Friedman*, 440 U.S. at 9. Plaintiff's bar is hidden behind the façade of a licensed barber shop. Described as "intentionally discrete," "to access the bar, patrons enter though [sic] a back-alley door tucked between a wall and a wood fence adorned with a small barber pole."

(Filing 1, ¶ 3). Inside, they find "a vintage barber chair, a barber pole, and small television that displays a history of barbering." (*Id*. ¶ 24); (Filing 8 at 4).

But patrons also see a fully equipped service station, including a service mirror, tools, and capes. (Filing 13-7 at 5-6). Only after patrons are granted access through a "hidden door" do they see the bar area. (Filing 1, ¶ 24). The public-facing side of the business presents exclusively as a licensed barber shop, including using the title and barber pole reserved by statute and trademark for use by licensed barbers.

The Barber Act's restrictions were codified precisely because there were no statutory prohibitions on businesses indicating to the public they offered barbering services without employing a licensed barber. (Filing 13-2). To protect against deception and codify the exclusive preexisting use of these marks, the Nebraska Legislature's 2009 amendments to the Barber Act made it unlawful to use or display a barber pole in advertising or to use the title barber shop to indicate barber services are offered without a license. Neb. Rev. Stat. § 71-201(5), (6); *see also* Neb. Admin. Code, ch. 3, § 003.01 (effective Dec. 18, 2022). Plaintiff's misleading commercial speech is exactly the type of speech the Barber Act was designed to prevent.

The title "The Barber Shop Blackstone" is inherently misleading. Nowhere in the name is any indication that the business is a bar, not a barbershop. Compounding this is the logo, which includes the title and a barber pole—expressions exclusively associated with the barbering industry. *See* (Filing 1, ¶ 4); (Filing 13-1, ¶¶ 34-36). Plaintiff's present two separate versions of their logo: one in the space for a "profile

picture" and one in the header image. Both prominently display the name "The Barbershop" and a barber pole. (*Id.*). The "profile picture" contains only those two elements. The header image contains additional elements—an alteration to the bottom of the barber pole to show the outline of a bottle, the outline of two straight edge razors, a stylized version of the location ("OMA BLACKSTONE NEB"), and the phrase "WHERE THE BUZZ IS REAL." (Filing 1, ¶¶ 4, 18). These elements do not alleviate the logo's misleading nature.

The more expansive logo contains the two most confusing elements—the title and the barber pole. Straight edge razors are elements exclusively used by licensed barbers. (Filing 13-1, ¶ 15). The phrase "where the buzz is real" does not help—the sounds of buzzing clippers in a barber shop and traditional "buzz haircuts" are at least as "real" as the "buzz" experienced when imbibing alcohol. (Filing 13-1, ¶ 38). The only element in the logo with potentially two different meanings is the small outline of a bottle; however, given the logo's barber theme, the bottle could credibly be understood to be aftershave. The Plaintiff's logo is inherently misleading.

These impressions are underscored by how the business advertises itself. Plaintiff's advertisements include a barber chair and a visible barber pole. (Filing 1, ¶ 4). There is no indication that Plaintiff does not also operate a licensed barber shop. Plaintiff claims their "advertising furthers one message – it's a bar." (Filing 1, ¶ 5). This is plainly incorrect. While the text on the page includes references to drinks, cocktails, and whiskeys, the part of the advertisement that immediately draws a reasonable consumer's attention is the display of a barbershop, not a bar. (*Id.* ¶ 4).

Page **14** of **29**

Plaintiff's misleading commercial speech is exactly the type of speech the Barber Act was designed to prevent. This problem is exacerbated by Plaintiff's other advertising. Plaintiff claims they do not offer barbering services, (Filing 9-1, ¶ 11), nor hold themselves out as barbers. (*Id*. ¶ 12); (Filing 1, ¶ 4). But their advertising tells a different story.



The REAL Blackstone District @real_b... · 31m
The Barber Shop, Blackstone's newest bar is hosting their grand opening next Friday! Party starts at 7pm. 5 cabinet giveways, secret menu, drink specials, and special guest barbers!

(Filing 13-8 at 6); *accord* (Filing 13-7 at 1, 5-6).

This advertisement again uses the barber shop imagery and name, giving a clear impression that this is a barber shop. There is a reference to a bar and to drink specials, neither of which take away from the overall imagery associated exclusively with barber shops. But it also mentions that Plaintiff's will have "special guest barbers" at their party. At minimum, this gives the impression that Plaintiff is not only a bar but also a licensed barber shop. *See* (Filing 13-1, ¶¶ 64-65).

Plaintiff's front facing signage also does not help resolve any likely confusion or misunderstanding as to whether they operate a licensed barber shop. Plaintiff notes that "[t]here is no front-facing signage," and "no signs advertising the business" except "a small barber pole." (Filing 8 at 2-3). But this makes the speech more misleading, not less. The barber pole is associated exclusively with the barber industry by tradition, statute, and trademark, and using that exclusive symbol as the only outdoor signage serves to further ensure reasonable consumers are likely to be confused. With no other qualifying signage, the message to potential customers is unequivocal: this is the location of a barber shop.



(Filing 13-4); *see also* (Filing 1 ¶¶ 3, 30(a)); (Filing 13-9).

And Plaintiff's speech is actually misleading. Their advertisements and logo have caused confusion. Since opening in early 2025, at least one other barber in Blackstone was confused, as were some of her clients. (Filing 13-6, ¶¶ 8-10); (Filing 13-7); (Filing 13-8). When the other barber learned she was not the only person confused, she contacted Plaintiffs. (Filing 13-6, ¶ 11).

This confusion should not come as a surprise. Reasonable consumers will actually be misled when a business adopts all the markings of a regulated profession, advertises the presence of special guest barbers, and juxtaposes their logo with the furnishings of a licensed barber shop. (Filing 13-8 at 6); *accord* (Filing 13-7 at 1, 5-6). This deceptive speech is precisely why the Barber Act was amended in 2009.

Plaintiff's reliance on *Express Oil Change* is misplaced. In *Express Oil Change*, the Fifth Circuit found the name "tire engineers" was not inherently or actually misleading, only potentially misleading commercial speech entitled to First Amendment protections. *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Prof. Engineers & Surveyors, et al.*, 916 F.3d 483, 488-92 (5th Cir. 2019). "Engineer" had different meanings in different contexts, and there was no evidence of consumers being actually misled. *Id.* at 490. But here, the title "barber shop" and the barber pole do not have multiple meanings—they are solely used as source identifiers of a licensed barber shop. (Filing 13-1, ¶¶ 12-13; 34-36); Neb. Admin. Code, ch. 3, § 003.01. And there is evidence of actual confusion. (Filing 13-6, ¶¶ 8-10).

Speakeasys are not inherently unlawful, but their commercial speech is subject to reasonable regulation when it is inherently and actually misleading—especially when they adopt the exclusive elements of a regulated trade. Plaintiff's speech is inherently and actually misleading and subject to reasonable regulation without restriction from the First Amendment.

*Unlawful Commercial Speech.* The Barber Act also protects against unlawful commercial speech. It is a violation of Nebraska law to use a mark "registered under

the Trademark Registration Act in connection with the … advertising of any … services" in a way that causes confusion or misunderstanding as to the source of such services. Neb. Rev. Stat. § 87-139. If the Barber Board does not enforce its trademarks against unauthorized use the marks can be abandoned. *Id.* § 87-128(1)(a)-(b). And no court has determined that the trademark is invalid. *Id.* § 87-136(3).

The Plaintiff is using the Barber Board's certification marks as a source identifier. *See Yankee Pub. Inc. v. News America Pub. Inc.,* 809 F.Supp. 267, 276 (1992). The use of these certification marks by an unlicensed business is unlawful because it has caused confusion or misunderstanding as to whether the Plaintiff is a licensed barbershop. (Filing 13-6, ¶¶ 8-10). The First Amendment does not protect unlawful speech. Therefore, Plaintiff is not likely to succeed on the merits of their claim.

> B.    *The State has a substantial government interest in reserving the title barber shop and the barber pole for only licensed barbers.*

Plaintiff acknowledges there are substantial governmental interests at stake. (Filing 8 at 12). However, Plaintiff cites only the stated legislative declarations in the Barber Act. (*Id.*). While those represent substantial governmental interests, they are insufficient to describe the breadth of the substantial governmental interests involved.

The legislative declarations in the Barber Act provide that "(1) The provisions and regulations of the Barber Act are enacted in the interest of public health, public safety, and the general welfare; and (2) the skilled trade of barbering and the

operation of barber shops is affected with a public interest." Neb. Rev. Stat. § 71-225. Public health, public safety, and the public's general welfare are of paramount importance to the State and certainly constitute substantial governmental interests. But within those broader categories are additional governmental interests of substantial importance.

To become a licensed barber, the State requires significant training and requires the barbers to practice their trade in accordance with exacting standards. *See, e.g.* 51 Neb. Admin. Code, ch. 3, 12 (providing sanitation requirements for barbers and minimum curriculum and requirements for schools of barbering). The State has a significant interest in ensuring that anyone holding themselves out as being a barber by using the title barber shop or displaying or using a barber pole in advertising are subject to those standards. Protecting these marks from indiscriminate use furthers several substantial governmental interests.

The State has a substantial interest in ensuring that consumers are not confused or deceived about the nature of a business using barbering marks, given the title barber shop and the barber pole have long been used exclusively with the trade of barbering. *See Friedman*, 440 U.S. at 15 (finding a substantial government interest "in protecting against deceptive and misleading use of optometrical trade names"); (Filing 13-1, ¶¶ 13, 34-36).

The State has a substantial interest in ensuring that if a business offers services similar to barbering, consumers are not confused or deceived about whether

Page **19** of **29**

the services are provided under the requirements of the Barber Act, which affects both consumer confusion and public health and safety. (Filing 13-1, ¶ 15).

And the State has a substantial interest in protecting its valid trademarks. *See* Neb. Rev. Stat. § 87-127. Encouraging people to go into the trade of barbering is incentivized by exclusive use of the marks by which a barber is identified. Dilution of those marks through indiscriminate use will make it less likely that a barber will be willing to undergo the training, certification, and standards of practice associated with barbering. (Filing 13-1, ¶¶ 10-11, 37).

Each of these are substantial governmental interests that justify not only the State's regulation of barbering but also reserving the use of the title barber shop and the use and display of a barber's pole in advertising for barbers alone.

C.     *The Barber Act furthers the government's substantial interests and is no broader than necessary.*

The Barber Act is narrowly tailored to further the government's substantial interests. The Barber Act directly advances the health, safety, and general welfare of the public through exacting license standards and requirements. The restrictions on the unauthorized use of the certification marks protect the public against deception. And it protects the Barber Board's trademarks. The Barber Act is no broader than necessary to further these substantial interests.

1.     Protecting the health, safety and general welfare of the public.

There are significant reasons for the Barber Act's prohibitions. All licensed barbers are required to display a barber pole. 51 Neb. Admin. Code, ch. 3, § 003.01A.

This display signifies that a licensed barber has undergone extensive training and is subject to regulations to protect public health and safety. Neb. Rev. Stat. §§ 71-201(1); 71-225. And the display of the barber pole signifies the establishment meets sanitation requirements, has proper infection control processes, is properly licensed and trained.

There are significant sanitation requirements a business must meet before being permitted to display a barber pole. 51 Neb. Admin. Code, ch. 3, §§ 003.01A-K, 004.01-004.09. An inspection must occur before the shop opens, and regularly thereafter, to ensure compliance with the sanitation requirements. *Id.* § 005. The Barber Board has also prescribed infection control guidelines to protect against the transmission of disease, which is of the utmost importance considering the use of straight razors and chemicals. *Id.* ch. 7.

There are extensive requirements to receive a barber's license. An applicant's background and moral character are considered. Neb. Rev. Stat. § 71-217. The applicant must have a high school diploma or equivalent certificate and complete no less than eighteen hundred hours of instruction and training from an approved school. *Id.* §§ 71-204, 71-208 to 71-208.08; *see also* 51 Neb. Admin. Code, ch. 12. And if a cosmetologist wants to become a barber, they must complete an additional eight hundred hours of training focused on shaving and hair clipper techniques. (Filing 13-1, ¶ 15).

The Legislature determined that restricting unlicensed businesses from using the barbering professions exclusive symbols protected the health, safety, and welfare

of the public. Neb. Rev. Stat. § 71-225. Through the Barber Act, the Legislature "reasonably could find that since [at least 1927], the word [Barber Shop]" and the barber pole "has become distinctive to" the profession of barbering. *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 534; (Filing 13-1, ¶¶ 34-36). There are stringent requirements to become a barber and to practice barbering. Limiting the title "barber shop" and the use and display of the barber pole to only licensed barbers ensures that when the public sees those symbols in association with a business, they can have confidence in the kinds of services rendered, the qualification of the barber providing those services, and the standards under which those services will be performed.

The Barber Act only prohibits using the "title of barber or barber shop" in a manner to indicate barbering services are provided, Neb. Rev. Stat. § 71-201(5), and displaying "a barber pole or us[ing] a barber pole or the image of a barber pole in its advertising" unless the business employs a licensed barber. *Id.* § 71-201(6). These restrictions are no more extensive than necessary to further the government's substantial interest in the public's health, safety, and welfare.

   2.  Protecting the public from deception.

The Barber Act's narrow restrictions further the substantial interest in protecting the public from deception. The restrictions on the barber pole concern only the display or use of a barber pole or the image of a barber pole in advertising without a barber's license. Neb. Rev. Stat. § 71-201(6). Likewise, the title of barber shop is restricted so that entities do not hold themselves out as barber shops unless licensed

under the Barber Act. Neb. Rev. Stat. § 71-201(5). The restrictions only reach unlicensed businesses that indicate they offer barbering services.

These restrictions are supported by the historical use of "barber shop" and the barber pole as indicators that barbering services are offered. (Filing 13-1, ¶¶ 34-36); *see also Noble v. Davis*, 204 Ark. 156, 161 S.W.2d 189, 189-90 (1942). Plaintiff identifies the location of its business to the public through the display of a barber pole. (Filing 1 ¶ 30); (Filing 9-1 ¶ 23); (Filing 13-4). And Plaintiff's advertising uses "barber shop" and the barber pole in a manner that will confuse the public about whether barbering services, or barbering services and alcohol, are offered at its business. (Filing 13-7); (Filing 13-8 at 6-8).

Plaintiff fails to recognize that they *are* "hold[ing] themselves out as performing barbering or other personal grooming services" by using the barbering professions exclusive marks. (Filing 8 at 14). The fact that a hypothetical consumer who may be confused by the signage will not receive a dangerous straight-edge shave once they enter the business does not solve the problem—this hypothetical consumer was injured by the fact that they walked into the business under false impressions given by the business's advertising. That hypothetical consumer will no longer understand the term barber shop or display of the barber pole as necessarily indicating that the business engages in barbering, which harms the barbering industry.

Moreover, the Barber Act is categorically different from the laws at issue in *Central Hudson, Virgina Pharmacy*, and *Bates.* In each case, the restrictions banned

entire industries from advertising to consumers. *Va. State Bd. of Pharm.*, 425 U.S. 748 (finding a law restricting pharmacists' ability to advertise the price of drugs violates the First Amendment); *Bates*, 433 U.S. 350 (finding a disciplinary rule that restricted attorney advertising violates the First Amendment); *Central Hudson Gas & Elec. Corp.*, 447 U.S. 557 (finding a New York ban on advertising that promotes the use of electricity violates the First Amendment). But the Court was also clear that misleading and deceptive speech can be regulated. *Va. State Bd. of Pharm.*, 425 U.S. at 771-72; *Bates*, 433 U.S. at 383; *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 563-64.

Unlike in *Central Hudson*, *Virginia Pharmacy*, and *Bates*, the Barber Act does not restrict truthful information from being communicated to consumers. A licensed barber or barber shop must display the trademarks to truthfully communicate to the public that barbering services are offered. The restrictions Plaintiff takes issue with are restrictions on misleading and deceptive commercial speech.

The barber pole cannot be used in advertising and "barber shop" cannot be used in a manner to indicate licensed barbering services are offered when they are not. This prevents confusion and protects the trademarks from being used as a source identifier without permission and upholds the regulatory goals of the Barber Act. Under *Friedman* and *San Francisco Arts & Athletics, Inc.*, this is constitutional. *Friedman*, 440 U.S. at 16 (finding restrictions on optometrists' use of trade names does not violate the First Amendment); *San Francisco Arts & Athletics, Inc.*, 483 U.S.

at 540 (finding restrictions on commercial and promotional uses of "Olympic" and associated symbols without permission does not violate the First Amendment).

To be clear, Plaintiff is not prohibited from operating a barber-themed bar. Plaintiff is merely prohibited from holding itself out as operating a barber shop by using the exclusive marks associated with barbering as a façade for that bar. This is not a significant infringement on Plaintiff's commercial speech. It is narrowly tailored to protect consumers from confusion, both about the kind of business it is and the quality of services it will provide, and to protect the barbering industry by ensuring that those who meet the stringent requirements to become a barber may identify themselves as such by using the historic and exclusive trademarks held by the State and associated with that skilled trade.

III. **There is no irreparable harm when a person uses a protected certification mark without permission.**

The Barber Act does not violate Plaintiff's First Amendment rights. Thus, there cannot be irreparable harm by prohibiting the unauthorized use of the Barber Board's certification marks. *Mutual of Omaha Ins. Co.*, 836 F.2d at 402-03. Nor does the Barber Act violate the First Amendment, it only restricts misleading and deceptive commercial speech. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, *supra*; *Bates v. State Bar of Az.*, *supra*; *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, *supra*; *Friedman v. Rogers*, *supra*.

Plaintiff's basis for irreparable harm is that the threat of enforcing the Barber Act deprives them of their commercial speech rights. (Filing 8 at 16). But Plaintiff is

mistaken. The First Amendment does not protect misleading and unlawful commercial speech. The Barber Act is therefore a valid restriction on Plaintiff's unprotected commercial speech. And Plaintiff's failure to show irreparable harm "is a sufficient ground to deny a preliminary injunction." *H&R Block, Inc.*, 58 F.4th at 951 (citations omitted).

## IV.    The balance of harms weighs in the Barber Boards favor.

Granting Plaintiff's request for a preliminary injunction would harm the Barber Board and prevent enforcement of its trademark rights. If granted, the preliminary injunction would interfere with lawful efforts to protect against unauthorized use of certification marks and misleading and deceptive commercial speech.

Injury is presumed when a trademark owner seeks a preliminary injunction and establishes a likelihood of confusion. *See Mutual of Omaha Ins. Co.*, 836 F.2d at 403. A party that seeks an injunction to prevent the enforcement of a trademark owner's rights likewise injures the owner of the trademark. *Contra. id.* Preliminarily enjoining the Barber Board from enforcing its certification marks constitutes an injury that weighs in the Barber Board's favor.

Preventing enforcement of the Barber Act would also subject the public to ongoing confusion. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. V, Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977))). Plaintiff's misleading and

unlawful commercial speech would cause harm to the exclusive association of the title "barber shop" and use and display of the barber pole with businesses regulated under the Barber Act. This factor weighs in the Barber Board's favor.

## V.    Maintaining the status quo is in the public interest.

The status quo is that the Barber Board can enforce the Barber Act against persons holding themselves out as barbers without a license. Maintaining the status quo is in the public interest because the Barber Board's actions, and the Barber Act's prohibitions, do not violate Plaintiff's First Amendment rights. *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 540. The Barber Board has also consistently enforced its trademark rights. (Filing 13-1, ¶¶ 25-27). Failing to allow the Barber Board to do so here could lead to the loss of its trademark rights. *See* Neb. Rev. Stat. 87-136(3)(a). This factor also weighs in the Barber Board's favor.

### CONCLUSION

For the above reasons, the Barber Board requests this Court deny Plaintiff's request for a preliminary injunction.

Submitted March 12, 2026.

> **MICHAEL HILGERS, in his official capacity as Attorney General of Nebraska; TARA J. STERNS, JOSEPH A. SCOVILLE, and COURTNEY A. DAUBENDIEK, in their official capacities as members of the Nebraska Board of Barber Examiners, Defendants.**
>
> By:    MICHAEL T. HILGERS, #24483
> *Nebraska Attorney General*

Page **27** of **29**

By:    *s/ Joseph W. McKechnie*
       Joseph W. McKechnie, #27894
       Joshua E. Dethlefsen, #24467
       *Assistant Attorneys General*

       OFFICE OF THE ATTORNEY GENERAL
       1445 K Street, Room 2115
       Lincoln, NE 68509-8920
       Telephone: (402) 471-2682
       Fax: (402) 471-4725
       Joseph.mckechnie@nebraska.gov
       Joshua.dethlefsen@nebraska.gov


       *Counsel for Defendants.*

## CERTIFICATE OF COMPLIANCE

Pursuant to NE. Civ. R. 7.1(d), the undersigned hereby certifies that the foregoing principal brief contains 6,878 words (including the caption, headings, footnotes, and quotations) in compliance with said rule. The undersigned utilized the word count function of Microsoft Word for Microsoft Office 365.

By:   *s/ Joseph W. McKechnie*
Joseph W. McKechnie
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2026, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, causing notice of such filed to be electronically served on Plaintiff's counsel of record.

By:   *s/ Joseph W. McKechnie*
Joseph W. McKechnie
*Assistant Attorney General*