IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| OSTERIA SEGRETO, LLC,<br><br>          Plaintiff,<br><br>    vs.<br><br>MICHAEL HILGERS, Attorney General of Nebraska, in his official capacity; TARA J. STERNS, in their official capacities as the members of the Nebraska Board of Barber Examiners; JOSEPH A. SCOVILLE, in their official capacities as the members of the Nebraska Board of Barber Examiners; and COURTNEY A. DAUBENDIEK, in their official capacities as the members of the Nebraska Board of Barber Examiners,<br><br>          Defendants. | | **8:26CV65**<br><br><br>**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Osteria Segreto ("hidden tavern" in Italian), formerly "an Italian speakeasy," has restyled itself as "a barber shop themed bar" named "The Barber Shop Blackstone." Filing 1 at 1 (¶ 2). However, by doing so, it has allegedly run afoul of the Nebraska Barber Act, Neb. Rev. Stat. § 71-201 *et seq.*, which among other things prohibits businesses from using the title of "barber" or "barber shop" or displaying a "barber pole" without a state-issued license to practice barbering. Filing 1 at 2 (¶ 6). In this action against the Nebraska Attorney General and members of the Nebraska Board of Barber Examiners, Osteria Segreto asserts that the impending enforcement of the Nebraska Barber Act against it violates its commercial speech rights under the First and Fourteenth Amendments. Filing 1 at 3 (¶ 7). This matter is now before the Court on Osteria Segreto's Motion for Preliminary Injunction. Filing 7. After full briefing and a hearing on April 16, 2026, and for the reasons stated below, the Court enters this memorandum and order denying Osteria Segreto's Motion for Preliminary Injunction.

## I.   INTRODUCTION

### A.  Findings of Fact

As the Supreme Court explained some time ago, "A party is not required to prove his case in full at a preliminary injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted). Thus, none of the substantive issues discussed in this opinion are foreclosed from being relitigated in subsequent proceedings. *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citing *Camenisch*, 451 U.S. at 395). The preliminary findings of fact set out here are drawn from the Complaint and the parties' submissions in support of and opposition to the Motion for Preliminary Injunction.

### 1.  The Barber Shop Blackstone

Plaintiff Osteria Segreto, LLC, doing business as The Barber Shop Blackstone, is a limited liability company organized under the laws of the State of Nebraska, with its principal place of business in Omaha, Nebraska. Filing 1 at 3 (¶ 8). In February 2025, Osteria Segreto, LLC, applied for and received approval from the Nebraska Secretary of State for the use of the trade name "The Barber Shop Blackstone" for a business described as a "bar that serves alcohol only." Filing 1 at 4 (¶ 17); Filing 9-2 (Application for Registration of Trade Name).[1] The Bar opened the following month. Filing 1 at 4 (¶ 17).

---

[1] The Complaint alleges that The Barber Shop Blackstone applied for the trade name, Filing 1 at 4 (¶ 17), but the Application states that the applicant was "Osteria Segreto LLC," Filing 9-2. The Court will distinguish between Osteria Segreto as the plaintiff and The Barber Shop Blackstone as the business at issue.

Mike DiGiacomo, a member of Osteria Segreto, LLC, and his siblings decided in 2025 "to change the Bar's concept to one linked to our familiar roots—a barber shop themed bar" that "pays homage to my father, his barber friends, and the count[l]ess people who frequented the space years ago" when it had been a hair salon. Filing 9-1 at 1–2 (¶¶ 2–5, 7–8). The Bar's logo, shown at right, is a monochromatic barber pole with the name "The Barber Shop" and the tag line, "Where the Buzz is Real." Filing 1 at 4 (¶ 18).



According to the Complaint, the Bar "is intentionally discreet," with access "through a back-alley door tucked between a wall and a wood fence that is adorned with a small [red, white, and blue] barber pole." Filing 1 at 2 (¶ 3). The entry is shown below left in a detail extracted from Filing 13-4 (Defendants' Ex. 4). Patrons enter a small anteroom, shown below right, Filing 13-8 at 7, where they "see a lone vintage barber chair, a barber pole, and small television that displays a history of barbering," and "[a] bouncer greets customers, checks their IDs, and allows them through a hidden door into the bar." Filing 1 at 4–5 (¶ 19).




The record does not contain a sufficiently clear photograph of the interior of the Bar to be illustrative. However, the Complaint describes the interior of the Bar as follows:

> Inside, patrons access a bar that sits at the front of the long but narrow space. Opposing the small bar are high-top tables that run the length of the venue. The walls are filled with historical pictures of barbers and barbering tools. The bar is dimly lit, but at the end of the narrow space is a small seating area next to a floor-to-ceiling light installation designed to mimic the banded lights of a barber pole.

Filing 1 at 5 (¶ 20). "Once inside, patrons order from a menu that reflects the building's long history of hairstylists and barbers," including drinks called "the 'Scotch and [Scissors],' the 'Classic Cut Old Fashioned,' and the 'Barber's Flight.'" Filing 1 at 2 (¶ 3); Filing 9-1 at 3 (¶ 27) (listing drinks by their correctly spelled names).

The Bar has no front-facing signage, but it does have a social media account that advertises its "carefully curated cocktails," as shown below left. Filing 1 at 2 (¶ 4) (including image below). The Bar also advertised one or more special events, including an advertisement, as shown below right, Filing 13-8 at 6, for the grand opening that mentioned "5 cabinet giveways [sic], secret menu, drink specials, and special guest barbers!"





2. *The Board of Bar Examiners*

Defendant Michael Hilgers is the Attorney General of the State of Nebraska charged with carrying out the laws of the State. Filing 1 at 3 (¶ 9). Defendants Tara J. Sterns, Joseph A. Scoville, and Courtney A. Daubendiek are respectively the President, Vice President, and a member of the Nebraska Board of Barber Examiners (the Board). Filing 1 at 3 (¶¶ 10–12). The Board is "charged with administering, investigating, and enforcing the provisions of the Barber Act," with "authority to bring suit on behalf of the state of Nebraska for violations of the Barber Act." Filing 1 at 3 (¶¶ 10–12).

In support of its opposition to Osteria Segreto's Motion for Preliminary Injunction, Defendants submitted *inter alia* the Declaration of Kennth J. Allen, who is the Executive Director of the Board. Filing 13-01 at 1 (¶ 3). Consistent with the allegations about the Board just above, Allen avers that the Board was established to regulate the barbering profession within Nebraska and to enforce the provisions of the Barber Act. Filing 13-1 at 2 (¶ 6). Allen explains that for individuals in Nebraska to qualify for a certificate of registration to practice barbering, individuals must complete one thousand eight hundred (1,800) hours of training in a barber school or college or graduate from an approved school or college, and pass both a written and a practical examination to determine their fitness to practice barbering. Filing 13-1 at 4 (¶ 16). Part of Allen's duties are to ensure that only licensed barbers use or display a "barber pole" or the image of a "barber pole" in their advertising and that only licensed barbers use the title "barber" or "barber shop." Filing 13-1 at 2 (¶ 8). He travels the entire state performing inspections, licensing shops, and investigating complaints. Filing 13-1 at 7 (¶ 33).

Allen avers, "In my opinion, as Executive Director of the Barber Board, license[e]s in Nebraska have had exclusive use of the titles of barber and barber shop since 1927." Filing 13-1 at 7 (¶ 34). Allen also avers that the Board's records indicate that since at least 1967, licensed

5

barbers were required to display a barber pole in each barber shop. Filing 13-1 at 8 (¶ 36). He avers

further that in 1987, the Board obtained a "mark" with the Nebraska Secretary of State over barber

poles, defined as "spiral stripes, red, white, and blue or any combination of them," and the Board

has renewed and maintained this "registered service mark" ever since. Filing 13-1 at 6–7 (¶ 28);

Filing 13-9 at 2. The nature of this barber pole mark is of some significance in this case.

Documentary evidence submitted by Defendants shows that the Board applied for the

barber pole "service mark" on November 17, 1987, stating that it would be used in the following

ways:

> (b) If a service mark, by displaying it: In advertisements of the service  yes , on
> documents, wrappers, or articles delivered in connection with the service rendered
> yes , in other fashion  yes . If so, specify:  all aspects of business conducted by
> currently licensed barber shops.

Filing 13-9 at 2 (¶ 6(b)) (underlining indicating applicant's insertions in the Trademark or Service

Mark Application).

The documentary evidence also includes the response dated April 26, 1988, of an Assistant

Attorney General in the Nebraska Department of Justice to an inquiry by the then-Director of the

Board of Barber Examiners "Re: Registration of Service Mark." Filing 13-9 at 4. The response

states in part,

> You have inquired as to the enforceability of a service mark for licensed
> barbers in the State of Nebraska. The service mark identified by you is a barber
> pole with spiral stripes of red, white, and blue or any combination thereof.
> Neb.Rev.Stat. §87-301(6) (Reissue 1987) states that: "Service mark shall mean a
> mark used in the sale or advertising of services to identify the services of one person
> and distinguish them from the services of others;" Thus, a service mark is used to
> identify the goods or services of an individual as opposed to the goods or services
> of a specific group. My understanding of the type of mark you have contemplated
> would more accurately be a "collective mark." Neb.Rev.Stat. §87-301(3) states that
> collective mark means: "A mark used by members of a cooperative, association, or
> other collective group or organization to identity goods or services and distinguish
> them from those of others, or to indicate membership in the collective group or
> organization."

While the barber pole which you seek to use for the collective mark has been associated with barbers since the Fifth Century, A.D., there still may be some problems with enforcement of the logo exclusively for licensed barbers in this State. When a word or symbol has been in the public domain for a period of time, it is no longer susceptible to exclusive appropriation. Unfair Competition, Callman, §18.11. This would definitely limit its appropriation by a specific individual or company. It is not clear, however, if it would also limit its appropriation by a broader section of the population, such as barbers, for exclusive identification of their trade.

Another consideration is whether cosmetologists could also use the barber pole symbol under the theory of offering a similar service. There is case law that a generic or common symbol or term may be used by those offering a similar service. While the difference between barbers and cosmetologists is apparent in a review of the statutes and I am sure is exceedingly apparent to the barbers themselves, it is unknown whether a court would determine that the two professions are similar in nature since both are offering a service primarily aimed at the cutting or styling of hair.

There is no case law directly on point relating to the registration of the barber pole or other ancient symbol of a profession as a collective mark for current and licensed members of that profession. Therefore, we cannot assure the outcome of a court challenge. The basic problems to enforcement have been set out above. This does not purport to be a complete discussion of all potential problems since additional problems may develop in relation to specific circumstances. However, as stated above, there is no case law on point and it is possible that the court might rule in favor of the barbers.

Please keep our office advised as to your plans relative to registration of the barber pole as a collective mark, if the Secretary of State's Office provides for such a registration. Again, while the enforcement of the use of the barber pole exclusively for barbers is not overly optimistic, there still is a chance that we would be able to convince the courts of the necessity for such limitation as well as convincing them that the barber pole is still held to be a symbol which the public associates exclusively and primarily with the barber profession.

If you have any additional questions or concerns, please contact the undersigned Assistant Attorney General.

Filing 13-9 at 4–5. At a minimum, this letter indicates that the Board was informed of the difference between a "service mark" and a "collective mark" in 1988.

The next document in the record is labeled "BARBER POLE COLLECTIVE MARK," showing only a "Filed" date stamp of May 16, 1988, and a "Received and filed for record" stamp

7

for the State of Nebraska Secretary's Office, but no image or description of the mark. Filing 13-9 at 6. The Court will discuss in its legal analysis below the significance of this document. The record shows that the Board thereafter filed applications for renewal of the barber pole mark, identified as a "service mark," for ten-year periods on June 9, 1997, Filing 13-9 at 7; May 10, 2007, Filing 13-9 at 8; and May 19, 2017, Filing 13-9 at 9.

In Allen's opinion, licensees in Nebraska have had exclusive authorization to display a barber pole or use a barber pole or the image of a barber pole in their advertising since the Board registered the barber pole as a "trademark" in 1987. Filing 13-1 at 7–8 (¶ 35). Allen avers that the Board does not charge a licensing fee for the use of its "trademark," but the Board does grant permission to entities for the use of its "trademark." Filing 13-1 at 7 (¶ 29). In 2000, the Board issued its express consent for approved barber schools to use its barber pole "registered service mark." Filing 13-1 at 7 (¶ 30).

### 3. The Board's Enforcement Actions

Allen avers that on April 7, 2025, the Board received a complaint from Lauren Garrison. Filing 13-1 at 8 (¶ 39). Garrison avers that she is "a licensed barber in the State of Nebraska" who "work[s] in the Blackstone District of Omaha, Nebraska." Filing 13-06 at 1 (¶ 3). The text of Garrison's complaint, in the form of an email from Garrison to the Board, states the following:

> This whole bloody concept has irritated me so much with the barber pole in the speak easy. I'm not sure if they are going to be actually cutting hair but they mentioned guest barbers. The whole theme of this place is so disrespectful to the trade I wish people would stop making money off of it because it's a cool idea.
>
> Hoping Ken gets to check this place out and see what's going on or at least make them take down the pole and not have any guest barbers.
>
> I've attached some pictures.
>
> Reach out if you need anything else[.]

Filing 13-8 at 1; *see also* Filing 13-1 at 8–9 (¶¶ 40, 42). The attached images include the one shown

above of the anteroom to the bar, Filing 13-8 at 7,

and the one shown to the right that is the

advertisement identified by Garrison as

mentioning "guest barbers," Filing 13-8 at 6.

Allen avers, "These advertisements identified

that the business was using the title barber shop,

using barber poles to advertise, promoted special

guest barbers, and included elements of a



licensed barber shop, such as a barber chair, service mirror, tools, and capes. These are all required

fixtures of a licensed barber shop." Filing 13-1 at 9 (¶ 41).

Allen avers that after identifying the owner of the business as Osteria Segreto, LLC, he

sent a letter dated April 15, 2025, to Osteria Segreto informing the owners that the business's use

of the title "barber shop" and use of a "barber pole" in its advertising violated state law. Filing 13-

1 at 9 (¶ 44). In most pertinent part, the letter stated the following:

> The Nebraska Board of Barber Examiners is a Statutorily created board charged with protecting the health, safety, and welfare of the public while administering the Barber Act. Neb. Rev. Stat. section 71-201(5) prohibits any entity from using the title of "barber shop" unless such entity is a licensed state barber shop. Neb. Rev. Stat. section 71-201(6) prohibits any entity from displaying a barber pole or using the image of a barber pole in its advertising unless such entity is licensed to provide barbering services and offers barbering services,
>
> The Board has no record of The Barber Shop Blackstone obtaining a license to operate a barber shop. Violations of the Barber Act carry both civil and criminal consequences. The use of the barber shop title, barber poles, and images of barber poles are inappropriate and must be corrected. We are confident that this matter can be resolved amicably. We invite you to provide more information to the Board of Baber Examiners and amend your business practices to comply with Nebraska law.

Filing 9-3 at 1.

DiGiacomo responded to the Board's letter by informing the Board that he does not provide, nor intend to provide, barber services. Filing 1 at 5 (¶ 22); Filing 1-2 at 1 ("While we fully intend to comply with Nebraska law, we believe the statutes referenced—Nebraska Revised Statutes 71-201(5) and (6)—may be overly broad or outdated when applied to businesses like ours that are not, and never intend to be, barber shops in any capacity."); Filing 9-5 at 1 (same). He added, "We are a cocktail bar—not a personal grooming establishment—and no reasonable person would expect to get a haircut or shave from our staff." Filing 1 at 5 (¶ 22); Filing 1-2 at 1 (same); Filing 9-5 at 1 (same). DiGiacomo answered "no" to two questions that had been posed in the Board's April 15, 2025, letter: "Does The Barber Shop Blackstone provide or intend to provide barbering services?" and "Does The Barber Shop Blackstone intend to apply for a barber shop license?" Filing 1-2 at 1; 9-5 at 1. DeGiacomo answered, "We seek discussion with you on a resolution" in response to three further questions: "Does The Barber Shop Blackstone intend to continue to use the title of 'barber' or 'barber shop'?"; "Does The Barber Shop Blackstone intend to continue to display a barber pole both inside and outside the establishment?"; and "Does The Barber Shop Blackstone intend to continue to use the image of a barber's pole in its advertising?" Filing 1-2 at 1–2; Filing 9-5 at 1–2.

On June 24, 2025, the Board sent Osteria Segreto another letter reiterating allegations that the Bar was violating Neb. Rev. Stat. § 71-201(5) concerning unlicensed use of the title "barber shop" and Neb. Rev. Stat. § 71-201(6) concerning unlicensed use of a "barber pole." Filing 1 at 5 (¶ 23); Filing 1-3 at 1; Filing 9-4 at 1. This letter added, "In addition to directly violating the Barber Act, your actions infringe on the Board's protected trademark and impede the Board's ability to regulate the barbering profession." Filing 1-3 at 1; Filing 9-4 at 1. Although this letter indicated a continuing willingness to meet to resolve the matter, it reiterated "that violations of the Barber Act

carry both civil and criminal consequences." Filing 1 at 5 (¶ 24); Filing 1-3 at 1; Filing 9-4 at 1.

The letter concluded as follows:

> Litigation can be an expensive and time-consuming process. The Board is obligated to defend the Barber Act and its trademark. If we do not receive a response shortly, the Board will initiate legal proceedings.

Filing 1 at 5 (¶ 24); Filing 1-3 at 1; Filing 9-4 at 1.

DiGiacomo eventually met with representatives of the Board to discuss possible solutions. Filing 1 at 6 (¶ 25); *see also* Filing 13-01 at 10 (¶ 52) ("[Allen] met with Mr. DiGiacomo and another representative of The Barber Shop Blackstone on August 5, 2025."). The Complaint alleges that DiGiacomo "initially agreed" to change the Bar's name and to re-color the barber pole, and the Board informed DiGiacomo that it would have to give final approval for a name change. Filing 1 at 6 (¶¶ 25–26); *see also* Filing 13-01 at 10–11 (¶¶ 53–57) (describing the meeting and stating Allen's opinion that an agreement was reached to change the name and the colors of the pole, and that the Board would need to give formal approval to the agreement). There was discussion of changing the name of the business to "The Bar-Bar." *Compare* Filing 1 at 6 (¶ 26) (asserting the Board suggested that name), *with* Filing 13-1 at 10 (¶ 54) (asserting that a representative of the Bar indicating the Bar was "willing" to change the name to "The Bar-Bar" or "The Barbar Shop Blackstone"). The Board ultimately approved a name change to "The Bar-Bar" at an October 2025 meeting. Filing 1 at 6 (¶ 26). DiGiacomo avers that he only "agreed to consider different names for the bar like 'The Bar-Bar,'" but that he ultimately decided not to change the name of the Bar or to remove the decorative barber poles. Filing 9-1 at 4 (¶¶ 37, 39).

On February 6, 2026, the Board sent another message via email to DiGiacomo regarding the Bar. Filing 1 at 6 (¶ 27). The message stated,

> The Board is aware that a red, white, and blue, barber pole is still [il]luminated and advertising at your establishment.

11

As you know, on October 26, 2025, the Board accepted your proposal to edit the colors of the pole and eliminate the use of the barbershop title.

The Board would appreciate an update regarding your compliance efforts.

Filing 1-4 at 1.

### B.  Procedural Background

On February 17, 2026, Osteria Segreto filed a Complaint for Preliminary and Permanent Injunction and Declaratory Relief (Complaint) asserting two causes of action against Defendants. Filing 1. The First Cause of Action is entitled "Unlawful Restriction of Free Speech in Violation of the First Amendment of the U.S. Constitution (through 42 U.S.C. § 1983)." Filing 1 at 8. This claim alleges,

> 36.    The Barber Shop Blackstone engages in activity protected by the First Amendment by, among other ways, using its trade name The Barber Shop Blackstone, displaying a physical barber pole at the secluded entrance to the bar, displaying a barber pole within the bar, and using a barber pole in its logo that is displayed both within the bar and in advertisements.
>
> 37.    The Barber Board seeks to prevent The Barber Shop Blackstone from using the name "barber shop" and displaying a barber pole in its current form, preventing the bar from marketing itself effectively and promoting itself through a unified theme both within the bar and in advertisement.

Filing 1 at 8 (¶¶ 36–37). The Second Cause of Action is entitled "Declaratory Judgment (through 28 U.S.C. § 2201)." Filing 1 at 8. This claim alleges,

> 39.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, states in relevant part:
>
> > In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
>
> 28 U.S.C. § 2201(a). As illustrated by the Barber Board's letters and under controlling authority, the Parties to this action have an actual and justiciable controversy.

40.    Specifically, The Barber Shop Blackstone contends that the Barber Board's attempts to force the bar to rename itself, remove all barber poles as currently designed from the property, and any barber poles in advertising violates the bar's rights of commercial free speech guaranteed by the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 561–66, 100 S. Ct. 2342, 2349–51 (1980).

Filing 1 at 9–9 (¶¶ 39–40).

In its Request for Relief, Osteria Segreto states,

The Barber Shop Blackstone respectfully requests an order from this Court:

41.    Declaring that The Barber Shop Blackstone's use of "Barber Shop" in its trade name is a proper and valid use under its commercial speech rights and any attempt by the Barber Board to prevent this use is an improper exercise of its state police powers.

42.    Declaring that The Barber Shop Blackstone's display of barber poles as currently designed on its property is a proper and valid use under its commercial speech rights and any attempt by the Barber Board to prevent their use is an improper exercise of its state police powers.

43.    Declaring that The Barber Shop Blackstone's use of a barber pole in its logo and advertising is a proper and valid use under its commercial speech rights and any attempt by the Barber Board to prevent this use is an improper exercise of its state police powers.

44.    Declaring that the Barber Act is unconstitutional as applied to The Barber Shop Blackstone.

45.    Permanently enjoining and restraining the Defendants and their members, agents, employees, officers, attorneys, successors, assigns, affiliates, and any persons in privity or concert or participation with any of them from interfering with The Barber Shop Blackstone's current use of the title "Barber Shop" or use or display of a barber pole.

46.    Awarding Plaintiff attorney fees and costs under 42 U.S.C. § 1988 for the prosecution of this action.

Filing 1 at 9–10.

On February 26, 2026, Osteria Segreto filed the Motion for Preliminary Injunction now before the Court with a supporting Brief and an Index of Evidence. Filing 7; Filing 8; Filing 9. In its Brief, Osteria Segreto asserts that Defendants are relying on "a sweepingly broad provision of

13

state law that prohibits non-licensed companies from using the ti[t]le 'barber' or 'barber shop' in advertising [and] also prohibits unlicensed companies from displaying 'a barber pole' or 'image of a barber pole' under threat of criminal and civil penalty." Filing 8 at 2 (citing Neb. Rev. Stat. § 71-201(5) and Neb. Rev. Stat. §§ 71-201(6), 220–220.01, respectively). Consequently, Osteria Segreto "seeks a preliminary injunction preventing the Barber Board from pursuing civil or criminal action [against The Barber Shop Blackstone] pending a final resolution on the merits." Filing 8 at 3. On March 12, 2026, Defendants filed their Opposition to Plaintiff's Motion for Preliminary Injunction, Filing 14, and an Index of Evidence in Opposition to Plaintiff's Motion for Preliminary Injunction, Filing 13. On March 30, 2026, Osteria Segreto filed its Reply Brief and a Supplemental Index of Evidence in Support of Motion for Preliminary Injunction. Filing 17; Filing 18.

By Order dated April 2, 2026, the Court set a hearing on Osteria Segreto's Motion for Preliminary Injunction for April 16, 2026. Filing 19 at 1 (¶ 1). The Order stated further,

> 2.    The hearing shall be on arguments and written submissions only. Not later than 12:00 p.m. CDT on Wednesday, April 8, 2026, any party who believes that live testimony is required to present its case on the Motion must file a motion requesting live witnesses demonstrating good cause for presentation of live testimony and indicating the estimated time required to hear the live testimony.

Filing 19 at 1–2 (¶ 2). No party filed a request for live witnesses by the specified deadline. The Order also stated,

> 3.    Both parties shall file exhibit lists of all evidence to be considered at the hearing not later than 12:00 p.m. CDT on Wednesday, April 15, 2023. All exhibits shall be identified by their docket numbers and docket page numbers. Exhibits already in the ECF filing record should not be filed again.

Filing 19 at 2 (¶ 3).

The parties filed their exhibit lists as required, each listing only evidence already filed. Filing 29; Filing 30. At the hearing, Osteria Segreto objected to paragraphs 9 and 10 of the

14

Declaration of Lauren Garrison, Filing 13-6 at 2 (¶¶ 9–10), on hearsay grounds.[2] Defendants objected to paragraph 28 of the Declaration of Mike DiGiacomo, Filing 9-1 at 3 (¶ 28), on foundation grounds.[3] The Court admitted all the unchallenged evidence and took the objections under advisement. The Court stated that it would give the challenged evidence the weight, if any, that the Court decided was appropriate. The Court now sustains the objections to the challenged evidence.

The Court turns to its ruling on Osteria Segreto's Motion for Preliminary Injunction.

## II.  LEGAL ANALYSIS

### A.  Preliminary Injunction Standards

Federal Rule of Civil Procedure 65 authorizes the courts to issue preliminary injunctions, but it does not identify the standards that the Court must apply in deciding whether or not to grant a request for a preliminary injunction. The Eighth Circuit Court of Appeals has filled the gap by explaining, "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase*

---

[2] In the challenged paragraphs, Garrison declares,

> 9.   I discussed the opening of The Barber Shop Blackstone with several of my clients.
>
> 10.   I am aware of several of my clients that were similarly confused about whether The Barber Shop Blackstone offered barbering services.

Filing 13-6 at 2 (¶¶ 9–10).

[3] In the challenged paragraph, DiGiacomo declares,

> 28.   To my knowledge, there has never been an instance where a member of the public believed that The Barber Shop Blackstone offered professional barbering services.

Filing 9-1 at 3 (¶ 28).

*Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025) ("In deciding whether to grant preliminary injunctive relief, courts consider the four *Dataphase* factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114)). No single factor is determinative or dispositive. *Schmitt*, 148 F.4th at 966. Thus, "the court should balance all the factors in considering whether the injunction should be granted." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023).

As to the first of these factors, the Eighth Circuit has explained,

> "While no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citations omitted). [The movant] "must demonstrate that [he] has a 'fair chance' of prevailing on the merits." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). "To show a fair chance of prevailing, [the movant] must show that [his] claims provide fair ground for litigation, but [he] need not show that [he] has a greater than fifty per cent likelihood of success." *Id.* at 1016–17 (internal quotation marks and citations omitted).

*Schmitt*, 148 F.4th at 966 (second and fourth alterations by this Court).

The next *Winter/Dataphase* factor is whether the movant "is likely to suffer irreparable harm in the absence of [injunctive] relief." *Bio Gen*, 142 F.4th at 600 (quoting *Winter*, 555 U.S. 20); *see also Schmitt*, 148 F.4th at 966 (stating that a movant must demonstrate "the threat of irreparable harm to the movant" (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114)). The Eighth Circuit has explained,

> "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable

16

relief." *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Even where a permanent injunction may be appropriate relief after a final decision on the merits, preliminary injunctive relief is not necessarily warranted if any interim harm can be remedied in a final judgment. *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

*Denali Summit, LLC v. Union Elec. Co.*, 158 F.4th 896, 899 (8th Cir. 2025). The Eighth Circuit has also stated, "A party is not required to prove with certainty the threat of irreparable harm, but it must prove that irreparable harm is likely in the absence of an injunction." *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 927–28 (8th Cir. 2025) (cleaned up) (quoting *Sleep No. Corp.*, 33 F.4th at 1018, in turn quoting *Winter*, 555 U.S. at 22).

As to the last two *Winter/Dataphase* factors, "when a state official acting in her official capacity is the nonmoving party"—as is the case here—"the public interest and the balance of harms merge into one factor." *Id.* at 929 (citing *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022)). In analyzing these factors, courts ask "whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (quoting *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024)). Also, "the public interest is generally 'served by maintaining the ability to enforce the law adopted by the [State] Legislature,' [but] it is also 'always in the public interest to protect constitutional rights.'" *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025) (quoting *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020)).

The pertinent factors must be considered in the context of certain additional principles. First, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Second, because a preliminary injunction is an extraordinary remedy, "the party seeking a preliminary injunction bears the burden of establishing the necessity of the remedy."

17

*Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009)), *cert. denied*, 144 S. Ct. 1350 (2024). Third, the "primary function" of a preliminary injunction "is to preserve the status quo until a court may grant full relief upon a final hearing." *Wilbur-Ellis Co., LLC v. Jens*, 139 F.4th 608, 611 (8th Cir. 2025). To put it another way, the purpose of preliminary injunctive relief "is not to give the movant the ultimate relief he seeks." *Lindell*, 82 F.4th at 618. Indeed, "[r]equiring [the defendant] to take affirmative action . . . before th[e] issue has been decided on the merits goes beyond the purpose of a preliminary injunction." *Tumey*, 27 F.4th at 665 (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993)). Finally, an injunction—if granted— must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024) (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022)). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Id.* (quoting *Biden*, 52 F.4th at 1048, in turn quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017)).

Here, Osteria Segreto requests a preliminary injunction to prevent the Board from pursuing civil or criminal action against The Barber Shop Blackstone pending a final resolution on the merits. Filing 8 at 3. Where the movant claims that such enforcement violates the movant's constitutional rights, the request for preliminary injunctive relief fits squarely within the primary function of a preliminary injunction to preserve the status quo until the Court can grant or deny relief upon a full hearing and record. *See Wilbur-Ellis Co., LLC*, 139 F.4th at 611 (explaining that this is the primary purpose of a preliminary injunction). Thus, the Court turns to consideration of whether the *Winter/Dataphase* factors demonstrate that Osteria Segreto has carried its burden to

obtain the extraordinary remedy of a preliminary injunction in this case. *See Winter*, 555 U.S. at 24 (explaining that a preliminary injunction is an "extraordinary remedy"); *Lindell*, 82 F.4th at 618 (explaining that the movant bears the burden of proving the necessity of a preliminary injunction).

### B. Defendants' Assertion of Trademark Protection

Osteria Segreto's initial arguments concerning a preliminary injunction focused entirely on application of the *Central Hudson* test for the constitutionality of restrictions on commercial speech in relation to enforcement of provisions of the Nebraska Barber Act prohibiting use of the terms "barber" and "barber shop" and use of a "barber pole" by unlicensed entities Filing 8 at 7–14 (citing *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York,* 447 U.S. 557 (1980)). However, Defendants' first response was to assert that it has trademark rights in "barber shop" and "barber pole" that "prevail" over First Amendment law and warrant the prevention of Osteria Segreto's use of "barber shop" and a "barber pole." Filing 14 at 8–12. Osteria Segreto responded to Defendants' trademark-based defense in its reply brief. Filing 17 at 2–12.

The Court concludes that Defendants' assertion that trademark law "prevails" over First Amendment law is flawed. Defendants are correct that in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, the Supreme Court stated, "'[T]he trademark law generally prevails over the First Amendment' when 'another's trademark (or a confusingly similar mark) is used without permission' as a means of 'source identification.'" 599 U.S. 140, 159 (2023) (quoting *Yankee Publishing Inc. v. News Am. Publishing Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992)). The problem

is that Defendants treat this statement as a black letter rule that trademark law always trumps First Amendment law, but that is not what the Supreme Court's decision says.[4]

Nothing in *Jack Daniel's Properties, LLC*, suggests that the Supreme Court intended to supplant a First Amendment analysis where, as here, a state actor attempts to regulate commercial speech by asserting a trademark. Not only was there no state actor attempting to enforce a law regulating commercial speech in *Jack Daniel's Properties, LLC*, there is not a single mention of "commercial speech" in that decision, let alone any mention of regulation of "commercial speech" by a governmental entity, such as the Board, nor any mention and rejection of the *Central Hudson* test as applicable to state regulation of commercial speech.

In contrast, when the Supreme Court has addressed regulation of commercial speech by governmental entities, it has applied the intermediate scrutiny test from *Central Hudson*. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("In *Central Hudson, supra*, we articulated a test for determining whether a particular commercial speech regulation is constitutionally permissible," and continuing to apply it); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554–55 (2001) (reiterating the *Central Hudson* test to determine the constitutionality of

---

[4] In *Jack Daniel's Properties*, the Supreme Court considered a case between a maker of a dog toy that looked like a bottle of Jack Daniel's whiskey and the owner of the Jack Daniel's trademark. *Id.* at 144. In other words, there was no state actor involved. Instead, the First Amendment issue involved the conflict between trademark law's protection of a mark and the First Amendment's protection of expressive content. *Id.* at 153–59. Specifically, the First Amendment aspect of the case was the applicability of trademark law versus the *Rogers* test for protection of expressive content in the trademark context, which considers, whether the challenged use of a mark "has no artistic relevance to the underlying work" or that it "explicitly misleads as to the source or the content of the work." *Id.* at 151 (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)). The Supreme Court concluded that the first question it had to resolve was the following: "Should the company have had to satisfy the *Rogers* threshold test before the case could proceed to the Lanham Act's likelihood-of-confusion inquiry?" *Id.* at 152–53. The Supreme Court answered that question, "Without deciding whether *Rogers* has merit in other contexts, we hold that it does not when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods." *Id.* at 153. The Supreme Court explained *inter alia*,

> So for those uses, the First Amendment does not demand a threshold inquiry like the *Rogers* test. When a mark is used as a mark (except, potentially, in rare situations), the likelihood-of-confusion inquiry does enough work to account for the interest in free expression.

*Jack Daniel's Properties, LLC*, 599 U.S. at 159.

regulations of commercial speech); *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73 (2022) (explaining that in *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 507–512 (1981) (plurality opinion), the Supreme Court found that an ordinance "regulated only commercial speech and so was subject to intermediate scrutiny [under the First Amendment] in any event" (citing *Central Hudson*, 447 U.S. 557)); *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 701 (8th Cir. 2021) (explaining that *Central Hudson* "provides the test for analyzing the constitutionality of laws burdening commercial speech." (citing *Central Hudson*, 447 U.S. at 566)).

The Court concludes that trademark law is inapplicable here—at least on the present record.[5] Importantly, Osteria Segreto did not seek preliminary injunctive relief from enforcement of trademark rights but from enforcement of provisions of the Barber Act, even as Osteria Segreto argued in reply to Defendants' Opposition that the trademark defense is a "red herring" and flawed. Filing 17 at 4, 6–12. At the hearing on April 16, 2026, Defendants also focused their attention on application of the *Central Hudson* test to the relevant state statutes.

In short, the Court will give no further consideration to Defendants' assertion of a trademark defense to a constitutional claim or the possibility of preliminary injunctive relief

---

[5] While the Court does not decide whether Defendants can assert the trademark rights on which they rely, the Court acknowledges that there are reasonable arguments that Defendants cannot do so. The preliminary record presented at this stage of the proceedings reasonably suggests that Defendants do not have the "certification" marks they claim, because they registered only a "service mark" in a "barber pole"; they may have attempted to register a "collective" mark in the barber pole, but they only renewed the "service" mark for successive ten-year periods, and they never registered "barber shop" as any kind of mark. *See* Filing 13-9 at 2 (¶ 6(b)); Filing 13-9 at 6; Filing 13-9 at 7–9. There is also a reasonable argument that the "barber pole" does not fit the statutory definition of a "service mark" in Neb. Rev. Stat. § 87-301(2) because it is not a mark used to distinguish the services of one person from those of others, but ostensibly applies to any number of unrelated people or business entities engaged in providing barbering services. Furthermore, there is a reasonable argument that any trademark in "barber shop" or "barber pole" is invalid as "generic" and "descriptive" without acquiring any "secondary meaning." *See Charter W. Bank v. Riddle*, 989 N.W.2d 428, 439 (Neb. 2023). The Court need not and does not determine the ultimate merits of such arguments at this time because the Court concludes that trademark law does not state the relevant test in this case; instead, *Central Hudson* does.

against enforcement of trademark rights. Instead, *Central Hudson* states the applicable test for governmental regulation of commercial speech, and Osteria Segreto's Motion does not seek a preliminary injunction against enforcement of trademark rights.

### C. Preliminary Injunctive Relief from Defendants' Enforcement of the Barber Act

Turning to the grounds for preliminary injunctive relief properly before the Court, Osteria Segreto argues that the First Amendment's protection of commercial speech bars enforcement of provisions of the Barber Act against the Bar. To put the parties' arguments on this issue in context, the Court begins this part of its analysis with a survey of the applicable statutes.

*1. The Regulatory Statutes*

The Barber Act includes the following legislative declaration of its purpose:

> The Legislature declares that: (1) The provisions and regulations of the Barber Act are enacted in the interest of public health, public safety, and the general welfare; and (2) the skilled trade of barbering and the operation of barber shops is affected with a public interest.

Neb. Rev. Stat. § 71-225. The Nebraska Barber Act defines "barbering," Neb. Rev. Stat. § 71-202,[6] and establishes qualifications to receive a certificate of registration to practice barbering.

---

[6] The definition of "barbering" in the Barber Act is as follows:

> Any one or any combination of the following practices, when done upon the human body by the use of chemical products for cosmetic or grooming purposes and not for the treatment of disease or physical or mental ailments, on any person, other than a member of the immediate family, shall constitute the practice of barbering: (1) Shaving or trimming the beard or cutting the hair; (2) dressing, arranging, styling, curling, waving, straightening, and relaxing of the hair by chemical or mechanical means; (3) giving face and scalp massages or treatment with oils, creams, lotions, or other preparations either by hand, mechanical appliances, or electrical appliances, including the applying of chemical and toiletry preparations, antiseptics, powders, oils, clays, or lotions to scalp, face, neck, or upper part of the body; (4) patterning, fitting, cleaning, styling, coloring, waving, or other similar work upon hair pieces or wigs; and (5) shampooing, bleaching, coloring, rinsing, hair weaving, or similar work upon the hair.

Neb. Rev. Stat. § 71-202.

Neb. Rev. Stat. § 71-204.[7] Another provision defines a barber's "license" to mean "a certificate of registration issued by the board." Neb. Rev. Stat. § 71-202.01(7). The Act further establishes licensing requirements for barber shops, including a requirement to be inspected "at least once each licensing period for the purpose of inspection in order to be eligible for a permit to conduct a barber shop, and no license shall be issued unless all deficiencies found by inspection of such shop have been corrected." Neb. Rev. Stat. § 71-219.02.

The Act contains the following definitions of "barber," "barber shop," and "barber pole":

(1) Barber shall mean any person who engages in the practice of any act of barbering;

(2) Barber pole shall mean a cylinder or pole with alternating stripes of red, white, and blue or any combination of them which run diagonally along the length of the cylinder or pole;

(3) Barber shop shall mean (a) an establishment or place of business properly licensed as required by the act where one or more persons properly licensed are engaged in the practice of barbering or (b) a mobile barber shop. Barber shop shall not include barber schools or colleges[.]

Neb. Rev. Stat. § 71-202.01(1)–(3).

The two provisions of the Barber Act that are the basis for the Board's enforcement actions are the following:

(5) No person, partnership, limited liability company, or corporation shall use the title of barber or barber shop or indicate in any way that such person or entity offers barbering services unless such person or entity is licensed pursuant to the act. No person, partnership, limited liability company, or corporation shall hold itself out as a barber shop or indicate in any way that such person or entity offers barbering

---

[7] The qualification requirements are the following:

A person is qualified to receive a certificate of registration to practice barbering (1) who has a diploma showing graduation from high school or an equivalent education as determined by passing a general education development test; (2) who is at least seventeen years of age; (3) who has completed one thousand eight hundred hours of training in a barber school or college; (4) who has graduated from a barber school or college approved by the Board of Barber Examiners; and (5) who has passed an examination conducted by the Board of Barber Examiners to determine his or her fitness to practice barbering.

Neb. Rev. Stat. § 71-204.

services unless such person or entity and the personnel who purport to offer barbering services in association with such person or entity are licensed pursuant to the act.

(6) No person, partnership, limited liability company, or corporation shall display a barber pole or use a barber pole or the image of a barber pole in its advertising unless such person or entity is licensed to provide barbering services pursuant to the act and the display or use of such barber pole or barber pole image is to indicate that the person or entity is offering barbering services.

Neb. Rev. Stat. § 71-201(5)–(6).

The Board of Barber Examiners, established under Neb. Rev. Stat. § 71-221, has the "authority to adopt and promulgate reasonable rules and regulations for the administration of the Barber Act." Neb. Rev. Stat. § 71-223. More specifically, the Board is authorized to conduct sanitary requirements inspections, which "shall include all activities, in addition to barbering as defined in section 71-202, taking place on the licensed premises." Neb. Rev. Stat. § 71-223.01. "Each school or barber shop shall be called upon at least once each licensing period for the purpose of inspection prior to the issuance of its license to be eligible for renewal of certification or registration." *Id.*

With this context, the Court turns to the question of whether Osteria Segreto satisfies the *Winter/Dataphase* factors.

2. *Osteria Segreto Has Insufficient Likelihood of Success under* Central Hudson

    a.  The *Central Hudson* Test

To determine whether Osteria Segreto has sufficient likelihood of success on the merits, the Court must apply the appropriate test. The Eighth Circuit has explained that *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), "provides the test for analyzing the constitutionality of laws burdening commercial speech." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 701 (8th Cir. 2021) (citing *Central Hudson*, 447 U.S. at 566)).

24

In *Central Hudson*, the Supreme Court recognized that the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson*, 447 U.S. at 563. However, the Eighth Circuit has recognized that "commercial speech is still protected from unwarranted governmental regulation." *Missouri Broadcasters Ass'n v. Schmitt*, 946 F.3d 453, 460 (8th Cir. 2020) (quoting *1-800-411-PAIN Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014), as cleaned up in *Schmitt*). As the Eighth Circuit has explained,

> Courts consider four prongs when determining whether a law unconstitutionally burdens commercial speech: (1) whether the commercial speech at issue concerns lawful activity and is not misleading; (2) whether the governmental interest is substantial; (3) whether the challenged law directly advances the government's asserted interest; and (4) whether the law is no more extensive than necessary to further the government's interest.

*Schmitt*, 946 F.3d at 460 (citing *Otto*, 744 F.3d at 1055, in turn citing *Cent. Hudson*, 447 U.S. at 566).

As to the first prong of the *Central Hudson* test, the Eighth Circuit has explained that "inherently misleading" commercial speech has no First Amendment protection. *Otto*, 744 F.3d at 1052 ("411–Pain's advertisements were 'inherently misleading' and thus not entitled to First Amendment protection under *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557, 563–64, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)."). More specifically,

> "Inherently misleading" speech is speech that "inevitably will be misleading" to consumers. *Bates v. State Bar of Ariz.*, 433 U.S. 350, 372, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). The "inherently misleading" character of speech may be inferred from the "particular content or method of the advertising" as well as from "experience [that] has proved that in fact such advertising is subject to abuse." *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). "Misleading advertising may be prohibited entirely." *Id.* Whether speech is "inherently misleading" is a question of law that we review de novo. *See Peel v. Att'y Reg. & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 108, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990) (plurality opinion) ("Whether the inherent character of a statement places it beyond the protection of the First Amendment is a question of law over which Members of this Court should exercise de novo review.").

*Otto*, 744 F.3d at 1056. The Supreme Court has not required proof of actual deception for an advertisement that was misleading on its face—that is, "[w]hen the possibility of deception is as self-evident as it [wa]s in [*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*.]" *See Otto*, 744 F.3d at 1061–62 (quoting *Zauderer*, 471 U.S. 626, 652 (1985), which involved attorney advertising that failed to satisfy a regulation to disclose that contingent-fee clients would have to pay costs if they lost).

As to the second prong of the *Central Hudson* test, the state bears the burden of identifying a "substantial interest" that justifies the challenged restriction. *Schmitt*, 946 F.3d at 460 (citing *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183 (1999)). Further,

> To satisfy the third *Central Hudson* prong, [the state] must show that the Statute advances its substantial interest "in a direct and material way." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)). This burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* (quoting *Edenfield*, 507 U.S. at 770–71, 113 S.Ct. 1792). The Statute "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Cent. Hudson*, 447 U.S. at 564, 100 S.Ct. 2343. Instead, [the state] must show that the Statute "significantly reduces" the alleged harms. *See 44 Liquormart, Inc. [v. Rhode Island]*, 517 U.S. [484,] 506, 116 S.Ct. 1495 [(1996)]. This requirement is "critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Greater New Orleans*, 527 U.S. at 188, 119 S.Ct. 1923 (quoting *Rubin*, 514 U.S. at 487, 115 S.Ct. 1585).

*Schmitt*, 946 F.3d at 460.

Finally, the fourth prong considers whether the "Statute's speech restriction as applied is not more extensive than necessary to serve its interest." *Id.* at 461.

> [The state] is not required to employ the least restrictive means conceivable, "but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Greater New Orleans*, 527 U.S. at 188, 119 S.Ct. 1923 (quoting

26

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). The Statute should indicate that [the state] "carefully calculated the costs and benefits associated with the burden on speech." *Id.* (cleaned up). "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

*Schmitt*, 946 F.3d at 461–62.

The Court considers next Osteria Segreto's likelihood of success on its constitutional claim by applying the *Central Hudson* test.

### b. The Parties' Arguments

Osteria Segreto argues that in the context of commercial speech that is non-misleading, intermediate scrutiny requires the government to show its regulation directly advances a substantial government interest and is no more extensive than necessary to serve that interest. Filing 8 at 7. Osteria Segreto argues that a more exacting level of scrutiny is applicable here because the challenged provisions of the Nebraska Barber Act are both speaker- and content-based. Filing 8 at 7. Applying the test from *Central Hudson*, Osteria Segreto argues that neither its use of the word "barber shop" in its title nor its use of a decorative "barber pole" is inherently, actually, or potentially misleading, and that the Board's general interest in regulating the barbering profession has no applicability in this case. Filing 8 at 8. As to "misleading" use, Osteria Segreto argued in both its briefing and at the hearing that the Court must consider the context in which "barber shop" and the "barber pole" are used. Filing 8 at 10 (citing *Express Oil Change, LLC v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 490 (5th Cir. 2019)). Osteria Segreto argues that it is not holding the Bar out as a place of barbering but as a bar. Filing 8 at 11. Osteria Segreto also contends that the Board has not and cannot adduce any evidence that the Bar's use of the name "The Barber Shop Blackstone" or its display of decorative barber poles results in

27

actual deception, where there is no evidence that anyone has ever been deceived. Filing 8 at 12. While Osteria Segreto does not dispute that the state has "substantial" interests in regulating the skilled trade of barbering, Osteria Segreto argues that the regulations do not "directly advance" that interest because it is not clear how banning every unlicensed business from using "barber shop" or a "barber pole" regardless of context would materially advance the interest. Filing 8 at 12–13. Finally, Osteria Segreto contends that the regulation is not narrowly drawn, because it bans all unlicensed entities from using "barber shop" or a "barber pole" rather than banning only unlicensed entities that hold themselves out as performing barbering or other personal grooming services. Filing 8 at 14.

Defendants argue that the Board is properly regulating misleading and unlawful speech. Filing 14 at 12. At the hearing, Defendants argued that the Bar's use of "barber shop" and a "barber pole" were both "inherently misleading" and misleading in context. They point out that patrons first encounter a fully equipped barber service station with a service mirror, tools, and capes used in barbering. Filing 14 at 13. Thus, Defendants contend that the public-facing side of the business presents as a barber shop, using the title and barber pole reserved for licensed barbers. Filing 14 at 13. Defendants assert that the title "The Barber Shop Blackstone" is inherently misleading, carrying no indication that the business is a bar not a barbershop, and using a logo with a barber pole that is exclusively associated with barbering. Filing 14 at 13. Defendants argue that the logo includes straight razors used exclusively by barbers; that the statement, "Where the Buzz is Real" is confusing in light of "buzz cut" haircuts; and that these things heighten the confusion produced by the barber shop title and the barber pole. Filing 14 at 14. Defendants point further to the confusing reference to "special guest barbers" in the grand opening advertisement. Filing 14 at 16. Defendants contend that the Bar's use of "barber shop" and a "barber pole" is "unlawful"

commercial speech because it appropriates the Board's registered trademarks. Filing 14 at 17. As to the state's substantial interest, Defendants point to the public welfare interests served by the regulation and to the significant training required for licensed barbers to ensure that persons holding themselves out as barbers meet high standards. Filing 14 at 19. Furthermore, Defendants argue that the state has an interest in protecting the public from deception. Filing 14 at 22. They argue that the restrictions are narrowly tailored in that they prohibit an entity from holding itself out as operating a barber shop by using the exclusive marks associated with barbering. Filing 14 at 25.

c. The Bar's Use of "Barber Shop" and a "Barber Pole" Is Misleading

The Court concludes that Osteria Segreto does not have "a fair chance of prevailing" on its constitutional claim, *see Schmitt,* 148 F.4th at 966 (stating preliminary injunction requirements), because the commercial speech involved in using the name "The Barber Shop Blackstone" and a "barber pole" is inherently misleading, *Schmitt,* 946 F.3d at 460 (stating the prongs of the *Central Hudson* test); *Otto,* 744 F.3d at 1056 (explaining the meaning of "inherently misleading"). This is a question of law. *Otto,* 744 F.3d at 1056.[8] Indeed, this is an instance in which the Bar's name and use of the barber pole are misleading on their face, that is, the possibility of deception is self-evident even without proof of actual deception. *See Otto*, 744 F.3d at 1061–62 (quoting *Zauderer,* 471 U.S. at 652).

---

[8] The Court rejects Defendants' assertion that the speech at issue is "unlawful" as well as "misleading" because it allegedly violates trademark laws. Again, the Court has concluded that trademark issues are irrelevant because the proper test in the circumstances of this case is set out in *Central Hudson*. Furthermore, the issue for application of the *Central Hudson* test is not whether the speech is somehow "unlawful" but "whether the commercial speech at issue concerns lawful activity." *See Schmitt,* 946 F.3d at 460. Speech about serving alcoholic beverages does not "concern [un]lawful activity."

Osteria Segreto argued in its briefing and at the hearing that whether speech is "inherently misleading" depends upon context, relying on *Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 490 (5th Cir. 2019). In that case, the question was whether automotive service centers in Mississippi operating under the name "Tire Engineers" violated state law restricting the use of the term "engineer." *Express Oil Change*, 916 F.3d at 486. The Fifth Circuit opined, "The term 'engineer' can mean many things in different contexts, and it is certainly not limited to those professionals licensed by Mississippi to practice engineering. It is not, therefore, devoid of intrinsic meaning." *Id.* at 490 (internal quotation marks and citations omitted). Of course, the out-of-circuit decision in *Express Oil Change* is not binding on this Court. More importantly, it is not applicable here, because nothing suggests that "barber" or "barber shop" can mean many things in different contexts and those terms are limited by statute to licensed barbers and licensed barber shops. Thus, unlike the situation in *Express Oil Change*, "barber" and "barber shop" are limited to licensed professionals.

Specifically, under Nebraska law, "barber shop" is defined expressly—and narrowly—as "an establishment or place of business properly licensed as required by the act where one or more persons properly licensed are engaged in the practice of barbering." Neb. Rev. Stat. § 71-202.01(3).[9] The "inherently misleading" character of calling the Bar "The Barbershop Blackstone" can be inferred from the "particular content or method of the advertising." *Otto*, 744 F.3d at 1056 (quoting *In re R.M.J.*, 455 U.S. at 203). The particular content of the Bar's monochromatic logo, Filing 1 at 4 (¶ 18), shown above in § I.A.1., suggests—indeed, states—that the business is a "barber shop." This "inevitably will be misleading" as to the services available to customers, which

---

[9] The remainder of the statutory definition of "barber shop" as a "mobile barber shop" has no apparent applicability to this case, and no party has argued that it does. *See* Neb. Rev. Stat. § 71-202.01(3).

are bar services not barbering services. *Otto,* 744 F.3d at 1056 (quoting *Bates,* 433 U.S. at 372). The Court would not hesitate to hold that calling a bar "The Hospital Blackstone," "The Doctor's Office Blackstone," "The Law Office Blackstone," or "The Department of Motor Vehicles Blackstone" would be inherently misleading. "The Barber Shop Blackstone" appears no different.

Furthermore, the "method of advertising," *see Otto,* 744 F.3d at 1056—which Osteria Segreto suggested at the hearing was the important "context"—falls well short of dispelling the "inherently misleading" character of Osteria Segreto's use of "barber shop." The misleading inference is not dispelled in the least by the inclusion of the tag line on the logo, "Where the Buzz is Real." Filing 1 at 4 (¶ 18). In the context of the name "The Barber Shop" and the "barber pole," the immediate suggestion is of a "buzz cut"; one would have to know that this ostensible barber shop is actually a bar to understand the pun, that is, as a reference to a "buzz" from alcohol, gossip, or excitement. *See* https://www.merriam-webster.com/dictionary/buzz (defining "buzz" as a noun to mean "rumor, gossip," and "fad, craze"); https://biologyinsights.com/what-is-a-buzz-from-alcohol-and-when-does-it-become-impairment/ (explaining, "The term 'alcohol buzz' describes the initial, pleasant physiological and psychological changes that occur shortly after consuming alcohol.").

Nor is the inevitably misleading inference neutralized by advertising that "The Barber Shop Blackstone" offers "carefully curated cocktails," Filing 1 at 2 (¶ 4) (shown in § I.A.1.), or advertising the grand opening of a "bar" called "The Barber Shop" that mentions "5 cabinet giveways [sic], secret menu, drink specials, and special guest barbers!" Filing 13-8 at 6 (shown in § I.A.1.). There is an inevitably misleading inference that "The Barber Shop Blackstone" provides barbering services although it may also provide alcoholic beverages—even if there is no evidence that anyone was actually deceived about the services or goods provided. *See Otto,* 744 F.3d at

31

1061–62 (quoting *Zauderer,* 471 U.S. at 652). The parties do not dispute that there are barber shops that also have liquor licenses.

The statutory definition of "barber pole" is also narrow. "Barber pole" is defined as "a cylinder or pole with alternating stripes of red, white, and blue or any combination of them which run diagonally along the length of the cylinder or pole." Neb. Rev. Stat. § 71-202.01(2). Osteria Segreto argued in both briefing and at the hearing that this definition encompasses blue and white poles (with no red), blue and red poles (with no white), and red and white poles (with no blue), thus "conjur[ing] a classic image that has nothing to do with barbers—candy canes and poles in Santa's workshop." Filing 17 at 17. The Court disagrees.

As a matter of plain language, "combination" means "a result or product of combining," while "them" means all three colors. *See, e.g.,* https://www.merriam-webster.com/dictionary/combination (defining "combination" as "a result or product of combining"); https://www.merriam-webster.com/dictionary/them (defining "them" as the "objective case of they . . . used as the object of a verb or preposition to designate a group of people or things. I drove the kids to school and dropped *them* off. We bought it for *them*. Please pick up your toys and put *them* away." (emphasis in the original)). Thus, "any combination of them" means that the colors may appear in any sequence, but all three must be present. The statute does not say "any combination of any of them" or "any combination of two or more of them." At the hearing, Osteria Segreto argued that "any combination of them" means "any combination thereof," so that it could mean two of the colors and not all three. The problem with this argument is that the statutory language is not "thereof" but "them," which does not embrace less than all three. Because the "barber pole" as defined can only be displayed by licensed barbers or barber shops, display of the "barber pole" "inevitably will be misleading to customers" because it suggests that the business

32

is a "barber shop" providing barbering services not a bar providing bar services. *Otto*, 744 F.3d at 1056 (quoting *Bates*, 433 U.S. at 372).

As to the second prong of the Central Hudson test, *see Schmitt*, 946 F.3d at 460, Osteria Segreto stated in its briefing that it "does not dispute that the[ ] purported state interests [set out in Neb. Rev. Stat. § 71-225], standing alone, advance a 'substantial' governmental interest." Filing 8 at 12. Osteria Segreto reiterated that concession at the hearing.

However, Osteria Segreto does dispute the third prong, which is whether the provisions of the Barber Act at issue "directly advance" that interest. Filing 8 at 3; *Schmitt*, 946 F.3d at 460 (stating the third prong as "whether the challenged law directly advances the government's asserted interest"). Osteria Segreto argued in its briefing that "it is unclear how banning *every* unlicensed business from using the words 'barber' or 'barber shop' *regardless of context* directly advances the government's interests in a material way." Filing 8 at 13 (emphasis in the original). However, the Court concludes that argument is more relevant to whether the statutory prohibitions are "narrowly tailored," the fourth prong, than it is to whether the statutes "directly advance" a "substantial" governmental interest. *Schmitt*, 946 F.3d at 460–62. Restricting unlicensed entities from using "barber shop" and a "barber pole" in their advertising plainly provides effective support for and directly advances the government's purposes of protecting both "the interest of public health, public safety, and the general welfare" and "the skilled trade of barbering and the operation of barber shops [that are] affected with a public interest." Neb. Rev. Stat. § 71-225; see *Schmitt*, 946 F.3d at 460 (explaining the third prong in terms of whether the regulation "provides only ineffective or remote support for the government's purpose"). This is so precisely because only licensed entities can properly use those words and that symbol rather than unlicensed entities that

33

might hold themselves out as providing barbering services in order to protect public health and the professional barbering trade.

As to the fourth prong, which concerns "narrow tailoring," *Schmitt*, 946 F.3d at 461–62, Osteria Segreto came nearer to the mark in both its briefing and its arguments at the hearing by asserting that there are obvious, less burdensome alternatives to the Barber Act's restrictions. Specifically, Osteria Segreto asserted in its briefing, "Instead of banning all unlicensed persons and entities from using the title 'barber' or 'barber shop' in commerce, the law could—and should—apply only to those who hold themselves out as performing barbering or other personal grooming services." Filing 8 at 14 (emphasis in the original). At the hearing, Osteria Segreto also argued that requiring licensed entities to provide a declaration or notice that they are licensed is also a more narrowly tailored requirement than barring unlicensed entities from using "barber" or "barber shop."

Osteria Segreto is correct that the existence of "numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration." *Schmitt*, 946 F.3d at 462. Nevertheless, the "fit" does not have to be "perfect" for the restriction to be "narrowly tailored." *Id*. at 461–62. The restriction here is "reasonable," and while it may not "represent . . . necessarily the single best disposition," it is one "whose scope is in proportion to the interest served." *Id*. at 461. The regulations reasonably serve the purpose of preventing unlicensed entities from indicating that they provide barbering services to the detriment of public health and the professional barbering trade.

In short, the Court concludes that Osteria Segreto has too little "likelihood of success" on the merits under the *Central Hudson* test to warrant preliminary injunctive relief, where "likelihood of success" is the "most significant" *Winter/Dataphase* factor. *Schmitt*, 148 F.4th at

34

966 (quoting *Home Instead*, 721 F.3d at 497). Thus, the lack of "likelihood of success" weighs heavily against issuance of a preliminary injunction in this case.

### 3. The Remaining Winter/Dataphase Factors Do Not Change the Outcome

The Court "should balance all the factors in considering whether the injunction should be granted." *Ng*, 64 F.4th at 997. Consequently, the Court will consider the remaining *Winter/Dataphase* factors, even though the first one is not satisfied. The Court concludes that the remaining factors do not change the balance against issuance of a preliminary injunction.

As mentioned above, "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Denali Summit*, 158 F.4th at 899 (quoting *Watkins*, 346 F.3d at 844). The Court acknowledges that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Schmitt*, 148 F.4th at 970 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). However, where Osteria Segreto has failed to show sufficient likelihood of success on its claim of a violation of its First Amendment commercial speech rights, the "irreparable harm" factor weighs little if at all in favor of a preliminary injunction because the harm is far from certain, great, or of such imminence that there is a clear need for equitable relief. *Denali Summit*, 158 F.4th at 899 (citing *Iowa Utils. Bd.*, 109 F.3d at 425). To put it another way, Osteria Segreto fails to prove that irreparable harm is likely in the absence of an injunction on regulation of the commercial speech at issue in this case. *See Iowa Migrant Movement for Just.*, 157 F.4th at 927–28.

Also as mentioned above, the last two *Winter/Dataphase* factors "merge" when "a state official acting in her official capacity is the nonmoving party." *Iowa Migrant Movement for Just.*, 157 F.4th at 929. As to the balance of harms, the likely harm to Defendants of a preliminary injunction on the ability to enforce the statute reflecting legislative determination of the public interest outweighs the harm to Osteria Segreto without a preliminary injunction when Osteria

35

Segreto's argument for such an injunction is unlikely to succeed. *See Trump*, 128 F.4th at 997 (asking "whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place"). Likewise, this is a case in which "the public interest" is served "by maintaining the ability to enforce the law adopted by the [State] Legislature." *Ass'n for Accessible Medicines*, 140 F.4th at 961 (cleaned up). The countervailing public interest in protecting constitutional rights carries comparatively less weight where the likelihood of success on the constitutional claim is slight. *Id.*

Thus, these factors reinforce rather than undermine the conclusion that a preliminary injunction is not appropriate.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Plaintiff Osteria Segreto's Motion for Preliminary Injunction, Filing 7, is denied.

Dated this 20th day of April, 2026.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge